## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ANDREW PERSAUD, Derivatively on Behalf of THE CHEMOURS COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> RICHARD H. BROWN, MARK P. VERGNANO, CURTIS V. ANASTASIO, MARY B. CRANSTON CURTIS J. CRAWFORD, DAWN L. FARRELL, SEAN D. KEOHANE, ERIN N. KANE, BRADLEY J. BELL AND MARK E. NEWMAN, <br><br> Individual Defendants, <br><br> -and- <br><br> THE CHEMOURS COMPANY, a Delaware corporation, <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Andrew Persaud ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

### NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal

Defendant The Chemours Company ("Chemours" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Chemours's reputation, goodwill, and standing in the business community and has exposed Chemours to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Chemours in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.      This action seeks to remedy wrongdoing committed by Chemours's directors and officers from February 16, 2017 through the present (the "Relevant Period").

3.      Chemours provides performance chemicals in North America, the Asia Pacific, Europe, the Middle East, Africa, and Latin America. It operates through three segments: Fluoroproducts, Chemical Solutions, and Titanium Technologies. The Fluoroproducts segment offers fluorochemicals, fluoropolymers, and fluoroelastomer products ("Fluoroproducts" or PFAS").

4.      The Chemours Company became a separate entity on July 1, 2015 via a spin-off of the Performance Chemicals division of E.I. du Pont de Nemours and Company ("DuPont"). DuPont's Performance Chemicals segment was extensively involved in the discharging of toxic Fluoroproducts into groundwater drinking supplies near its chemical plants. DuPont knew of the harmful effects of these products for many years; however, these harmful effects only later became known to the public as a result of various lawsuits against DuPont, which showed evidence linking Fluoroproducts exposure with serious health conditions, including deadly cancers. In the context of the possibility of this resulting in massive legal exposure and environmental liabilities, DuPont timely tried to offload these potential liabilities by spinning off the Performance Chemicals

division into Chemours.

5.     Pursuant to the spin-off, Chemours entered into a separation agreement, ("the Separation Agreement") whereby it took responsibility for two-thirds of DuPont's environmental liabilities and 90% of DuPont's pending environmental litigation by case volume.

6.     Beginning in February 2017, the Individual Defendants made various public statements affirming that it was unlikely that the liabilities would go above certain amounts and indicated the environmental liabilities of the Company were not nearly as large as they were. The market responded positively to these false re-assurances.

7.     Despite the Individual Defendants' representations about the Company's balance sheet, its control over the environmental liabilities, and its reduced risk portfolio, the reality of the Company's situation was that at the time of its spin-off, Chemours took on huge liabilities from DuPont which meant the Company was insolvent when it came into existence.

8.     Chemours admitted in court filings, during proceedings it commended via a complaint filed against DuPont ("the Verified Complaint"), that the Company and the individuals who directly operated the sites inherited from DuPont knew of the Company's huge, environmental liabilities but did not disclose these liabilities to investors.

9.     The Company has suffered as a result of the Individual Defendants' causing the Company to repurchase over $1 billion in shares of the Company's stock at artificially inflated prices while hiding the fact that the Company's financial results were inflated by the hugely understated environmental liabilities. Meanwhile, certain Individual defendants, Mark P. Vergnano and Mark E. Newman, sold their Chemours stock at artificially inflated prices based on material, nonpublic information. In total, these Individual Defendants disposed of almost $17 million worth of the Company's stock.

10.     As detailed herein, and as alleged in the ongoing federal securities class action in the District of Delaware styled *In Re The Chemours Company Securities Litigation* Case No. 1:19-CV-01911-CFC, (the "Securities Class Action"), Chemours's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have such jurisdiction.

13.     This Court has personal jurisdiction over each of the Individual Defendants because each Defendant is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Company is incorporated in this District. Venue is proper in this District because the Company and the Individual Defendants have conducted business in this District and Individual Defendants' actions have had an effect in this District.

## THE PARTIES

**Plaintiff**

15.    Plaintiff Andrew Persaud is and has continuously been a stockholder of Chemours during the wrongdoing complained of herein.

**Nominal Defendant**

16.    Defendant Chemours is a Delaware corporation. Chemours's shares trade on the NYSE under the ticker symbol "CC."

**Individual Defendants**

17.    Defendant Richard H. Brown ("Brown") is the Company's Chairman of the Board of Directors ("Board") and has served in this position since 2015.

18.    Defendant Mark P. Vergnano ("Vergnano") has been the Company's President and Chief Executive Officer since July 2015 and also serves on the Board. Previously, Vergnano was Executive Vice President of Performance Chemicals at the Chemours's former parent company, DuPont, since October 2009.

19.    Defendant Curtis V. Anastasio ("Anastasio") has been a Director of Chemours since 2015. Defendant Anastasio is a member of the Audit Committee.

20.    Defendant Mary B. Cranston ("Cranston") has been Director of Chemours since 2015. Defendant Cranston is a member of the Audit Committee.

21.    Defendant Curtis J. Crawford ("Crawford") has been a Director of Chemours since 2015. Defendant Crawford is a member of the Audit Committee.

22.    Defendant Dawn L. Farrell ("Farrell") has been a Director of Chemours since 2015.

23.    Defendant Sean D. Keohane ("Keohane") has been a Director of Chemours since 2018.

24.    Defendant Erin N. Kane ("Kane") has been a Director of Chemours since 2019.

5

Defendant Kane is a member of the Audit Committee.

25.     Defendant Bradley J. Bell ("Bell") has been a Director of Chemours since 2015. Defendant Bell is also the Chair of the Audit Committee.

26.     Defendant Mark E. Newman ("Newman") is the Company's Senior Vice President and Chief Operating Officer. He previously was the Company's Senior Vice President and Chief Financial Officer.

27.     Defendants Brown, Vergnano, Anastasio, Cranston, Crawford, Farrell, Keohane, Kane and Bell are collectively hereinafter referred to as the "Director Defendants."

28.     Defendants Bell, Anastasio, Cranston, Crawford, and Kane are collectively referred to as the "Audit Committee Defendants."

29.     The Director Defendants, and Defendant Newman are herein referred to as the "Individual Defendants."

30.     The Individual Defendants, because of their positions with Chemours, possessed the power and authority to control the contents of Chemours's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

31.     In 2013, DuPont commenced "Project Beta," which was aimed at ridding itself of DuPont's Performance Chemicals business and its enormous associated environmental liabilities. DuPont knew that the magnitude of the environmental liabilities meant that a sale of the Performance Chemicals division was not financially possible. No prospective purchaser would take on those huge liabilities without a discount, which would defeat the purpose of the transaction altogether, because there would be no net asset to be sold.

32.     Accordingly, on June 5, 2015, DuPont announced that its Board had approved the spinoff of Chemours. The Separation Agreement governing the spin-off granted the Company less than 20% of DuPont's business, while requiring it to assume significant liabilities, including: (1) $4 billion in debt, with the Company being required to use the proceeds of that debt to authorize a $3.91 billion dividend back to DuPont; (2) 90% of DuPont's pending litigation by volume of cases, including growing perfluorooctanoic acid ("PFOA")-related litigation; (3) 67% of DuPont's environmental liabilities covering over 80 sites; and (4) liabilities unrelated to the Company's business; for example, the DuPont's benzene liability in connection with the sale of its Performance Coatings business to another business, The Carlyle Group ("Carlyle"). Additionally, the Separation Agreement required the Company to indemnify DuPont against any liability "relating to, arising out of, by reason of or otherwise in connection with" the liabilities that DuPont had given to the Company without limitation, and required that the Company could not pursue any recourse from DuPont with respect to any of those liabilities.

33.     As of July 1, 2015, at the time of the Spin-Off, the Company faced significant liabilities. Just after the spin-off, the Company announced that it would have nearly zero future dividends. Further, the Company faced the issue of not having enough ongoing capital, which

forced it to lay off 1,000 employees, close some of its factories, sell business lines, and implement two corporate restructurings.

34.     As could be seen by the Company's "Transformation Plan" to improve its financial situation, Individual Defendants knew it was important to reassure investors that it was solvent and would come out the other side of the spin-off financially secure.

35.     Individual Defendants said the "Five Point Transformation Plan" would "transform" the Company's ominous balance sheet. Defendant Vergnano said the "key financial outcome of our transformation plan" was a strengthened, solid balance sheet, which would reduce the Company's "net leverage ratio," an important financial measure of a company's financial health demonstrating how many years it would take for the Company to pay back its debts (calculated by dividing net debt by adjusted EBITDA). At the time of the spinoff, the Company's "net leverage ratio" was extremely high, over 6x debt-to-EBITDA, but Individual Defendants assured investors that, as a result of the "Five Point Transformation Plan," the Company would "reduc[e] [] [its] net leverage to approximately 3x debt-to-EBTIDA".

36.     However, Individual Defendants were not able to lower the Company's net leverage ratio if its environmental liabilities outweighed its net assets. The large accruals required for such liabilities would significantly reduce the Company's earnings and therefore its adjusted EBITDA, which would result in a massive increase in the Company's net leverage ratio. Thus, the only option for the Company to reduce its net leverage ratio was to massively understate the Company's liabilities.

37.     On August 6, 2015, on the Company's first earnings call, Defendants assured shareholders that these liabilities were under control. Defendant Newman stated that the Company's liabilities were "well understood" and "well managed" and that the Company's own

executive team, which consisted of longtime DuPont veterans who formerly ran the Performance Chemicals business (including Defendant Vergnano), had been personally monitoring the Company's inherited environmental liabilities for a "long time":

> Our environmental liabilities are well understood and well managed . . . It is important to understand that these [liabilities] are well understood, and the current team has been monitoring these liabilities for many years.

38.     Individual Defendants also reassured the market that the Company's inherited liabilities were under control by disclosing precise potential maximum ranges of losses that could occur in excess of the amounts the Company had accrued. Immediately following the spin-off, Defendant Vergnano assured the market of the reliability of these maximum ranges and of the exceedingly low probability they would ever occur. For example, in the Company's Form 10-Q for the second quarter ended June 30, 2015, filed on August 6, 2015, shortly after the spin-off, the Company accrued $302 million for environmental remediation and stated that "the potential liability may range up to approximately $650 [million] above the amount accrued." During the Company's earnings call that same day, analysts asked Defendant Vergnano, "what's the probability your crude environmental liability increases by your stated [maximum] risk of $650 million?" Defendant Vergnano responded that the probability was very low because the liabilities were "very well characterized, very well documented sites" and "we don't see anything that's going to be a surprise."

39.     While the harms of Fluoroproducts were not known to the public until recently, internal DuPont documents demonstrate that they were known to DuPont and the Company for many years. Going back to the 1950s, DuPont's own scientists recorded the health effects of Fluoroproducts. By the 1960s and 1970s, DuPont had data in its files from animal studies demonstrating toxic effects on various species of animals. By the 1970s, DuPont knew that

Fluoroproducts were building up in the blood of humans and remaining there for extended periods of time. By the 1980s, DuPont took steps to redress concerns about liver damage and birth defects among workers exposed to Fluoroproducts by removing female employees from Teflon-related jobs and conducted internal studies on animals that caused it to label PFOA as a possible human carcinogen. In the 1990s, DuPont was engaged in a two-year rat study confirming that PFOA exposure could cause testicular, liver, and pancreatic tumors in rats. A DuPont scientific report came to the conclusion that these same risks were posed to humans.

40.     Many years later, DuPont's Performance Chemical Division's discharges of Fluoroproducts into the environment began to lead to related litigation that led to scientific studies demonstrating that exposure to Fluoroproducts could be lethal to humans. In 2005, as part of a settlement in relation to DuPont's alleged Fluoroproducts contamination from its Washington Works site in Parkersburg, West Virginia, DuPont agreed to pay for a "medical monitoring" health project aimed at determining the medical harms experienced by the exposed human population. Pursuant to this settlement, a panel of experts approved by DuPont was set up to investigate the effects of PFOA exposure by examining the blood of approximately 70,000 residents. The "Science Panel" finished its analysis in 2012 and found there were "probable links" between PFOA exposure and six diseases: high cholesterol, ulcerative colitis, pregnancy-induced hypertension, thyroid disease, testicular cancer, and kidney cancer. This led to 3,500 individuals coming forward as having been diagnosed with one of the six diseases due to PFOA exposure from Washington Works, which resulted in a multi-district litigation filed in the Southern District of Ohio against DuPont (the "Ohio MDL" which was absorbed by the Company upon the spinoff).

41.     Due to DuPont's extensive internal knowledge of the adverse health consequences of PFOA exposure, DuPont started producing a different type of perfluorinated alkylated substance

called "GenX" that was allegedly less toxic. In 2009, DuPont filed the required Toxic Substances Control Act ("TSCA") notices with the U.S. Environmental Protection Agency ("EPA") for two types of GenX compounds. When the EPA reviewed the data, it was concerned that, just like the previously produced Fluoroproducts, GenX would "persist in the environment" and "could bio-accumulate, and be toxic . . . to people, wild animals, and birds."

42.     Realizing its increasing exposure to Fluoroproducts-related litigation and environmental remediation expenses, DuPont restructured the company to rid itself of the Performance Chemicals unit and its associated liabilities altogether, a plan that would result in the formation of Chemours as an independent entity.

**The Individual Defendants' False and Misleading Statements**

43.     The Relevant Period begins on February 16, 2017 when Chemours held its year-end and fourth quarter 2016 investor conference call. During this call, Individual Defendants announced an annual adjusted EBITDA of $822 million and net income of $7 million, which Defendant Vergnano attributed to "truly a year of transformation guided by our Five-Point Transformation Plan," and commented that "Chemours exited 2016 in a very strong position" with the "effects of our transformation plan [] evident in our earnings results."

44.     Individual Defendants also mentioned the $671 million settlement of the Ohio MDL related to PFOA emissions. Chemours had announced the settlement three days beforehand and which investors were anxious to learn the details of the settlement. Vergnano described the Ohio MDL settlement as largely resolving the Company's PFOA-related liabilities, stating: "I would say ... after this period as we get through the finality of the settlement we should have our [PFOA] costs come down." Defendant Vergnano further said that the Company had made "great progress on reducing our net leverage" to 3.3x, "a tremendous reduction since spin," and as a result, "[w]e have sufficient balance sheet capacity to fund both our portion of [the Ohio MDL

settlement] and to support the planned expansions in 2017 and beyond."

45.   Defendant Newman further stated that "[w]e've always said we expect our environmental to be a fairly steady, mature liability. Now that we have clarity around PFOA, I think from a credit perspective our view is we are in a better position today with that as a known, certainly for the next five years."

46.   The quoted statements above were materially false and misleading. As opposed to the PFOA-related litigation and remediation being a "fairly steady, mature liability," such that it was now a "known," issue, in fact, and as Chemours admitted in the Verified Complaint, this category of inherited liability, was uncapped and ever growing and had only deepened the Company's "insolvency" that existed from the time the Company came into existence. Therefore, the Company had not exited 2016 in a "very strong position," and did it not have "sufficient balance sheet capacity" to pay for the $335 million settlement in addition to other costs. In fact, as Individual Defendants admitted in the Verified Complaint, this settlement amount was much larger in size than what the Company had anticipated. The only way Individual Defendants had made "great progress on reducing [Chemours'] net leverage" was not via its "Five-Year Transformation Plan," but by hiding and not revealing the true position regarding the Company's over $2.5 billion in liabilities which later became widely known and evident in the Verified Complaint. Moreover, far from PFOA costs "com[ing] down" in the future, they would actually increase substantially. The Ohio MDL settled only a small portion of PFOA litigation – 3,500 out of approximately 70,000 potential claims arising from the Washington Works facility. The PFOA litigation left unresolved by the Ohio MDL increased massively during the Relevant Period, with just one out of over 60 pending cases resulting in a $50 million verdict against DuPont and Chemours.

47.   On February 17, 2017, Individual Defendants filed Chemours' 2016 Annual Report

on Form 10-K (the "2016 Form 10-K"). In it, Individual Defendants stated a total environmental remediation cost of just $278 million, which they verified was "appropriate based on existing facts and circumstances," and further said that "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $535 million above the [$278 million] amount accrued at December 31, 2016." The 2016 Form 10-K further said that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."

48.    The statements above were materially false and misleading. As Individual Defendants later admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were hugely understated. In fact, they were over $2.46 billion, such that the Company was insolvent as a matter of law from the beginning of its existence throughout the Relevant Period.

49.    Individual Defendants' assertion that their reserve of only $278 million was "appropriate based on existing facts and circumstances" was false, and their statements as to maximum environmental liability "up to" a certain amount (here, "up to" $813 million) were wildly below the actual liability and known to Individual Defendants.

50.    Individual Defendants' statement denying the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also false and not reflective of the information known to Individual Defendants. In the Verified Complaint, Individual Defendants admitted that they were, in no uncertain terms, told by DuPont, before the Relevant Period that remediation costs for Chemours' New Jersey sites alone would be $337

million and $620 million during the Relevant Period. These were the lowest end estimates of the known amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Chemours even acknowledged that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, could be around $1.1 billion. This amount required disclosure to be posted under the Industrial Site Recovery Act  ("ISRA"). Additionally, Individual Defendants knew from the time the Company came into existence that remediation costs for its Fayetteville Works manufacturing site ("Fayetteville Works") alone would be over $60 million.

51.     Individual Defendants also misstated Chemours' huge liability for benzene-related litigation. The Form 10-K did not mention any costs for benzene-related litigation liability and said that while a loss was possible "a range of such losses cannot be reasonably estimated at this time."

52.     The statement above that Chemours' benzene liabilities "cannot be reasonably estimated" was materially false and misleading. In fact, Chemours' Verified Complaint acknowledged that a 2017 "comprehensive study" of its inherited benzene liability calculated that liability as amounting to no less than $111 million, an estimate that Chemours said was a reliable "real number." Further, Chemours has admitted that at the time of filing its 2016 Form 10-K, Individual Defendants were in possession of another, much lower $17 million estimate of the benzene liabilities from DuPont that Individual Defendants knew was "spectacularly" understated and demonstrated DuPont's "bad faith" in conducting the spin-off. Indeed, Defendants said in their Verified Complaint that it was evident that the benzene liability was far larger, as seen by the fact that DuPont was unable to assign this liability to Carlyle, which bought the related Performance Coatings business.

53.     On March 27, 2017, Defendant Vergnano repeatedly assured investors that the Company's inherited environmental liabilities were "behind us" while answering questions during Bloomberg Television's Wall Street Week. The first question noted that following Chemours' post spin-off stock price decline, "[t]here is quite a bit of bearishness … on the company" and queried Defendant Vergnano as to "[w]hat did investors and analysts get wrong?" Defendant Vergnano replied that as a spin-off of DuPont, Chemours inherited a number of great products and businesses "but we also had some liabilities we had to deal with.  Heavy level of debt, we had some legal liabilities, and that now has gone behind us. We've de-levered the company, those legal liabilities are behind us, and now people are starting to see the businesses we have turned out." Later in the interview, Vergnano was asked about whether the settlement of the Ohio PFOA MDL addressing 3,500 lawsuits removed the "overhang" of PFOA-related lawsuits "or are we going to see more cases come forward?" Vergnano replied, "I think that was the big issue that a lot of investors had, that one set of cases. . . . So I think that those 3,500 cases were the big cloud, the big overhang that are really behind us now."

54.     Additionally, on March 27, 2017, Vergnano was interviewed on CNBC's Power Lunch and assured investors that the Company had "executed every element of [its transformation] plan," and, as a result, "we're just about three times levered and we're where we want to be." Defendant Vergnano was also asked whether, given the Company's "global joint settlement with DuPont in terms of the PFOA issue," "are all the legal liabilities behind you at this point in terms of the money that you need to set aside or potential future litigation?"  In response, Vergnano, again, said that "I think that our transformation plan and the settlement that we worked out with DuPont really put those behind us."

55.     The statements above were materially false and misleading. Individual Defendants

have now confirmed, despite Defendant Vergnano's repeated statements, that the Company's environmental liabilities were not "behind us," and further, that the Company's transformation plan had not placed the Company "where we want to be" at "three times levered." In contrast, Individual Defendants admitted in the Verified Complaint that the Company's environmental liabilities amount to over $2.46 billion, which meant the Company was insolvent as a matter of law from the time it began its existence and throughout the Relevant Period. Therefore, Individual Defendants had met their goal of being "three times levered" not from "execut[ing] every element of [its transformation] plan," but through hiding these huge liabilities. Individual Defendants' assurances that the Company's "legal liabilities are behind us," and the "big [PFOA] overhang" was "behind us now," were false for the further reason that, as Defendants were aware, the Ohio MDL settlement resolved only a small portion of the Company's enormous environmental liabilities. Moreover, the Company's "settlement" with DuPont only covered 3,500 out of the approximately 70,000 PFOA cases arising from the Ohio MDL, which were only increasing.

56.     On May 2, 2017, Individual Defendants announced the Company's first quarter earnings for 2017, including adjusted EBITDA of $285 million and net income of $150 million. Defendant Vergnano said the  Company's "transformation plan has made a huge impact on our business," as Chemours had "achieved our target net leverage of at or below 3x, a key commitment we mad in announcing the transformation plan in August of 2015." Defendant Newman also emphasized that the Company had "reached our goal of reducing our net leverage ratio to be at or below 3x on a trailing 12- month basis" to 2.7x, and "[w]e are proud of the progress we've made to reduce our net leverage, which you may recall was north of 6x at spin." Defendant Newman further asserted that, as a result of reaching this benchmark, the Company had "balance sheet flexibility."

57.     On May 3, 2017, Individual Defendants filed with the SEC Chemours' Form 10-Q for Q1 2017. In it, Individual Defendants stated the Company had total environmental liabilities of only $279 million that was "appropriate under existing facts and circumstances," and said that "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $480 [million] above the [$279 million] amount accrued." The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."

58.     The statements above were materially false and misleading. In truth, the Company had not "reached our goal" of reducing its net leverage ratio to below 3x because of its "transformation plan," nor had it achieved "balance sheet flexibility." Rather, as Defendants have now admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law from the time of the spin-off and throughout the Relevant Period. Therefore, in reality, Individual Defendants' net leverage ratio only increased during the Relevant Period. The only way Individual Defendants were able to allegedly claim they had reduced it was by hiding and understating these massive liabilities. In light of these facts, Individual Defendants' assertion that their reserve of only $279 million was "appropriate based on existing facts and circumstances" was false, and their statement of calculation of maximum environmental liability "up to" a certain amount (here, "up to" $759 million) was nowhere near the actual known liabilities.

59.     Individual Defendants' statements rejecting the notion of any "material impact" on

the Company from remediation activities with respect to "any individual site" was evidently false. In the Verified Complaint, Individual Defendants admitted that they were unequivocally told by DuPont prior to the Relevant Period that remediation costs for Chemours' New Jersey sites alone would be $337 million, and during the Relevant Period, $620 million, material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Moreover, Chemours itself asserted that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion, an amount that was required to be posted immediately under ISRA. Additionally, Individual Defendants knew from the time of the spinoff that remediation costs for Fayetteville Works alone would be way over $60 million, which Individual Defendants knew was the minimum cost to stop future Fluoroproducts being discharged at Fayetteville Works, in addition to substantial clean-up costs for the decades of emissions that Individual Defendants were aware had previously occurred.

60.    The Form 10-Q also repeated the statements above, saying that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities. This statement and omission were false and misleading for the reasons explained above.

61.    On June 20, 2017, Chemours issued a press release saying it would be undertaking remediation activities at the Fayetteville Works site to address alleged contamination in the Cape Fear River caused by GenX emissions. However, the Company assured investors that Fayetteville Works emissions had not affected the safety of the areas water:

> Wilmington, Del., June 20, 2017 – The Chemours Company (Chemours) (NYSE: CC) today announced that it will capture, remove, and safely dispose of wastewater that contains the byproduct GenX generated from fluoromonomers production at its manufacturing plant in Fayetteville, North Carolina. Trace GenX amounts in the

Cape Fear River to date have been well below the health screening level announced by the North Carolina Department of Health and Human Services on June 12, 2017, and the company continues to believe that emissions from its Fayetteville facility have not impacted the safety of drinking water. However, Chemours will take these additional steps, embracing its role as a significant employer and member of the community. The capture and removal of this wastewater will commence on June 21, 2017. This action complements the abatement technology already put in place at the Fayetteville site in 2013.

62.     The above comments were false and misleading. While the Individual Defendants claimed that GenX "is safe and does not pose any harm to human health," the Company was in possession of various studies showing that GenX was "toxic" and was a major danger to human health, including a risk of cancer and birth defects, and had significantly contaminated drinking water from the Cape Fear River. Indeed, Individual Defendants admitted in the Verified Complaint that because of the major harms caused by Fayetteville Works' decades of Fluoroproducts going into the Cape Fear River, the Company faced significant liability, including "tort liability" that rendered it insolvent from the time of its existence through the Relevant Period. Individual Defendants further admitted in the Verified Complaint that the abatement technology DuPont installed in 2013 had not stopped GenX emissions. In fact, it had stopped only one of numerous waste outlets going into the river.

63.     On August 3, 2017, Individual Defendants held their earnings call announcing their results for the second quarter of 2017, including $361 million in adjusted EBITDA and $161 million in net income. Defendant Newman said there were "year-over-year increases across all key financial metrics" and "significant improvement in profitability," which Defendant Vergnano attributed to "the success of our transformation plan."

64.     Defendant Newman also said the Company had further lowered its net leverage ratio to 2.2x on a trailing 12-month basis and that it was "well below our net leverage target of 3x, including our new debt issuance, [which] demonstrates our significantly improved credit profile."

65.     Also on August 3, 2017, Individual Defendants filed with the SEC Chemours' Form liability accrual of just $278 million that Individual Defendants state was "appropriate based on existing facts and circumstances" and further stated that "underadverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $480 [million] above the [$278 million] amount accrued." The Form 10-Q also stated "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."

66.     The statements above were materially false and misleading. In reality, the Company had not had a "significant improvement in profitability" resulting from "success" of its transformation plan, nor had it "significantly improved [Chemours'] credit profile" through a reduction in net leverage. Rather, as Individual Defendants have now conceded in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far exceeded the Company's net assets and thereby making the Company insolvent as a matter of law at the time of the spin-off and throughout the Relevant Period. Therefore, the Company's "profitability" and "significantly improved credit profile" were in fact attributable to Individual Defendants' deliberate hiding and understatement of these massive liabilities. In light of these facts, Individual Defendants' assurances that $278 million was "appropriate based on existing facts and circumstances" was untrue, and their calculation of maximum environmental liability "up to" a certain amount (here, "up to" $758 million) was not based on the realistic environmental liabilities of the Company, known to Individual Defendants at that time.

67.     Individual Defendants' statements rejecting the possibility of any "material impact" on the Company from remediation activities with respect to "any individual site" was also untrue. In the Verified Complaint, Individual Defendants admitted that they were, in no uncertain terms, told by DuPont prior to the Relevant Period that remediation costs for Chemours' New Jersey sites alone would be $337 million, and during the Relevant Period, $620 million – material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Further, Chemours itself asserted that DuPont's $620 million estimate was " implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion, an amount that was required by law to be posted immediately under ISRA. Additionally, Individual Defendants knew from the time of the spinoff that remediation costs for Fayetteville Works alone would greatly exceed $60 million, the minimum cost to prevent future Fluoroproducts discharging at Fayetteville Works. This cost was in addition to substantial clean-up costs for the decades of emissions that Individual Defendants knew had already taken place.

68.     The Form 10-Q also repeated the statements above stating that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities. This statement and omission were also false and misleading for the reasons explained above.

69.     On November 3, 2017, Chemours held its earnings call for the third quarter of 2017, announcing adjusted EBIDTA of $381 million and net income of $207 million. Defendant Vergnano announced that the Company "had another great quarter" and that "[t]he significant progress we've made over the last couple of years to improve our cash generation and strengthen our balance sheet now affords us greater financial and strategic flexibility."

70.     Defendant Newman said the Company had further reduced its net leverage ratio to 2x on a trailing 12-month basis and that "[w]e're very pleased with the continued improvement in our credit profile as recently recognized in the ratings upgrade from Moody's." During the question and answer session, Newman again touted the Company's reduction in net leverage, stating "[w]e had committed to be at 3x in '17" and "[t]oday, we're at 2x . . . obviously, [we] continue to have as a key focus a strong balance sheet. It was recently recognized with the Moody's upgrade."

71.     On the same day, Chemours filed its Form 10-Q with the SEC for the third quarter of 2017. Defendants reported a total environmental remediation accrual of just $268 million, stating "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $510 [million] above the [$268 million] amount accrued." The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations or cash flows in any given year, as such obligation can be satisfied or settled over many years."

72.     These statements were materially false and misleading for the reasons explained above. In truth, the Company had not achieved "improved profitability," nor did it have "continued improvement in our credit profile" or a "strong balance sheet" as evidenced by the Moody's upgrade. As Individual Defendants have now conceded in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were massive (over $2.46 billion) and exceeded the Company's net assets and rendered it insolvent as a matter of law at the time of the spin-off and throughout the Relevant Period. Individual Defendants' allegedly "strong balance sheet" had only resulted from their hiding and vast understatement of these massive liabilities, as evidenced by the fact that, when the truth of the Company's financial condition was revealed,

financial analyst Moody's immediately changed its evaluation of the Company from "stable" to "negative," specifically stating that "[t]he negative outlook reflects the growing litigation risk and possible future costs associated with PFAS water contamination." Accordingly, Individual Defendants' assertion that their reserve of only $268 million was "appropriate based on existing facts and circumstances" was false, and their statement of the maximum environmental liability "up to" a certain amount (here, "up to" $778 million) was not a true reflection of the Company's environmental liabilities at that time.

73.     Individual Defendants' statement rejecting the possibility of any "material impact" on the Company from remediation activities with respect to "any individual site" was also untrue. In the Verified Complaint, Individual Defendants admitted that they were unequivocally told by DuPont prior to the Relevant Period that remediation costs for Chemours' New Jersey sites alone would be $337 million, and during the Relevant Period, $620 million, highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Moreover, Chemours itself asserted that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion, an amount that was required to be posted immediately under ISRA. In September 2017, the State of North Carolina filed a lawsuit against Chemours to stop the Company from discharging "all GenX compounds into the Cape Fear River" and "[r]emove, treat or control" all such discharges in order to continue operations at Fayetteville Works—remediation Defendants admitted in the Verified Complaint would cost in excess of $200 million.

74.     The Form 10-Q also repeated the statements above and stated that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refused to report any amount of liability for the benzene liabilities. These statements and omissions of fact were false and/or

misleading for the reasons explained above. During the earnings call, Patrick Duffy Fischer, a securities analyst at Barclays, asked about "[t]he situation down in North Carolina, the GenX . . . What's the status? [F]rom a headline perspective, what should investors expect?", to which Vergnano answered:

> I would say that this is a very normal chemical operation. And we've been working very closely with the regulators both in the state and at the federal level, and we continue to be very transparent and open in working with them through this issue. . . We do not believe that there [are] health effects of this in the drinking water, and we've stated that. But nonetheless, we stopped the effluent going forward, and we've thought that was a good-faith effort for folks in the community as well as good-faith effort with the regulators that we're dealing with.

75. The above statement was materially false and misleading. In contrast to Defendant Vergnano's claims that Fayetteville Works was a "very normal chemical operation," the Company was "very transparent and open" with regulators, and there were no "health effects of this in the drinking water," in truth, the Company was in possession of numerous studies showing that GenX was "toxic" and presented serious danger to human health, including a risk of cancer and birth defects and had significantly contaminated drinking water sourced from the Cape Fear River. Individual Defendants were also aware that, despite the 2009 EPA Consent Order requiring Individual Defendants to reduce any GenX emissions by 99%, they had been discharging GenX into the Cape Fear River since 1980 through a manufacturing process the EPA had not reviewed. Further, Individual Defendants admitted in the Verified Complaint that because of the significant harms caused by Fayetteville Works' decades of Fluoroproducts going into the Cape Fear River, a major drinking water supply, the Company had significant liability, including substantial "tort liability" that rendered it insolvent from the time of the spinoff through the Relevant Period.

76. On December 1, 2017, Chemours had an "Investor Day" conference to discuss the Company's financial performance. Defendants Newman, Vergnano, and certain other Company

representatives were involved. During the conference, Newman boasted that "[i]n less than 2.5 years, we have been able to de-lever our balance sheet, reducing our net leverage ratio from north of 6x to approximately 2x today, well below what we contemplated at spin and much faster too." Newman further stated that "[t]his improvement has been recognized by our rating agencies with the recent Moody's and S&P upgrades," resulting in a "strong BB credit profile." Vergnano stated that, accordingly, the Company's transformation plan was "complete and Chemours has been transformed":

> Our transformation plan powered tremendous financial improvement in both our earnings and on our balance sheet. We made some bold commitments, and we delivered on those. Today, we can officially declare that our plan is complete and Chemours has been transformed. In fact, this afternoon, we'll ring the New York Stock Exchange Closing Bell to symbolically mark this achievement for ourselves, our investors and our customers.

77.     Following a question from Christopher Perrella, a securities analyst at Bloomberg, asking "[h]ow … should I think about the cash spend for environmental issues over the next couple of years," Defendant Newman responded, that "[w]e had quite a bit of spend this year related to the Pompton Lake. And we expect that spend to gradually decline over time, while of course, the reserve will continue to come down as it has since been. So I wouldn't expect any significant change in cash spending."

78.     The statement above was materially false and misleading. In reality, Individual Defendants had not successfully "transformed" Chemours such that they had "de-lever[ed]" or "powered tremendous financial improvement" in its balance sheet, nor had Chemours achieved a "strong credit profile" as shown by the Moody's upgrade. Rather, as Individual Defendants have now admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far exceeded Chemours' net assets and rendered it legally insolvent at the time of the spin-off and during the Relevant Period.

Indeed, the Company's purportedly "strong credit profile" had only resulted from Defendants' concealment and vast understatement of these massive liabilities, as evidenced by the fact that, when the truth of the Company's financial condition was revealed, Moody's immediately lowered it rating of the Company from "stable" to "negative," and said "[t]he negative outlook reflects the growing litigation risk and possible future costs associated with PFAS water contamination." Furthermore, as Individual Defendants conceded in the Verified Complaint, their environmental liabilities were not expected to "come down" or "gradually decline over time". Indeed, the opposite was true. Individual Defendants expected their expenditures on environmental liabilities to grow.

79.     On February 15, 2018, the Company held its fourth quarter and full year earnings call, announcing annual adjusted EBIDTA of $1.4 billion and net income of $746 million. Defendant Vergnano said "2017 proved to be the year that we solidified our foundation, as we successfully completed our Five- Point Transformation Plan" which "helped us to achieve the impressive financial results that we just reviewed."

80.     Defendant Newman stated that "2017 proved to be a great finale to our transformation plan," as the Company had "maturely improved our profitability." Defendant Newman also stated that the Company had further reduced its net leverage ratio to 1.8x, "over a full turn less than our original leverage target of 3x," resulting in "strong balance sheet flexibility" that "really supports the objectives that we've laid out for shareholders."

81.     On February 16, 2018, the Company filed its 2017 Form 10-K with the SEC. Individual Defendants reported a total environmental remediation accrual of $253 million. In truth, this was actually a large reduction of close to 10% from the $278 million accrual the Company reported just one year earlier in its 2016 Form 10-K. With respect to that reduced accrual, Individual Defendants said that it was "appropriate based on existing facts and circumstances,"

and further stated that, "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $510 million above the [$253 million] amount accrued." The Form 10-K also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash flows at any given year, as such obligation can be satisfied or settled over many years."

82.     The statements above were materially false and misleading for the reasons explained. Moreover, Defendants had not "successfully" transformed the Company or "maturely improved [its] profitability" through the "successful[] completion" of its transformation plan, nor had Chemours achieved "strong balance sheet flexibility." Rather, as Individual Defendants have now conceded in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive — amounting to over $2.46 billion — that they far outweighed the Company's net assets and rendered it insolvent as a matter of law from the time of the spin-off and throughout the Relevant Period.  In light of these facts, Defendants' assertion that their reserve of only $253 million was "appropriate based on existing facts and circumstances" was false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $763 million) was not the true position.

83.     Individual Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also demonstrably false. In the Verified Complaint, Individual Defendants admitted they were unequivocally told by DuPont prior to the Relevant Period that remediation costs for Chemours' New Jersey sites alone would be $337 million, and during the Relevant Period, $620 million— highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net

income. Moreover, Chemours itself asserted that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion, an amount that was required to be posted immediately under ISRA. Additionally, and as Individual Defendants admitted in the Verified Complaint, regulatory scrutiny of the Fayetteville Works site, including the effects of the Fluoroproducts on public health, increased significantly throughout 2017, an indication that substantial remediation costs were to accrue. Individual Defendants later admitted in the Verified Complaint that these remediation costs exceeded $200 million.

84.     The Form 10-K repeated the statements above, stating that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities. This statement and omission were false and misleading for the reasons explained above. In addition, Chemours admitted in its Verified Complaint that by no later than 2018, DuPont had provided Chemours with the "comprehensive study" precisely estimating the benzene liabilities "at over $111 million."

85.     On May 4, 2018, Individual Defendants had an earnings call for the first quarter of 2018, announcing $468 million in adjusted EBITDA and $297 million in net income. Defendant Vergnano stated that the Company had achieved "meaningful improvements across all key financial metrics," and that its "net income and EPS doubled . . . driven by the strength of our business."

86.     Defendant Newman boasted that the Company now had a "solid balance sheet position," stating that "the strength of our balance sheet" had provided the Company "ample flexibility, which we put to good use during the quarter."

87.     On the same day, the Company filed with the SEC Chemours' Form 10-Q for Q1

2018. Defendants reported a total environmental remediation accrual of just $254 million that Defendants stated was "appropriate based on existing facts and circumstances," and that "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $510 million above the [$254 million] amount accrued." The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash lows in any given year, as such obligation can be satisfied or settled over many years."

88.     The statements above were materially false and misleading. In truth, the Company had not achieved a "solid," "strong" or "flexible" balance sheet that was "driven by the strength of our business." As Individual Defendants have now admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law at the time of the spin-off and throughout the Relevant Period. The Company's purportedly "solid" and "strong" balance sheet had only resulted from Defendants' concealment and vast understatement of these massive liabilities. In light of these facts, Defendants' assertion that their reserve of only $254 million was "appropriate based on existing facts and circumstances" was clearly false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $764 million) was not the true position of the Company.

89.     Individual Defendants' statement rejecting the possibility of any "material impact" on the Company from remediation activities related to "any individual site" was untrue. In the Verified Complaint, Individual Defendants admitted that they were, in no uncertain terms, told by DuPont prior to the Relevant Period that remediation costs for Chemours' New Jersey sites alone

would be $337 million, and during the Relevant Period, $620 million, material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Moreover, Chemours itself asserted that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion, an amount that was required to be posted immediately under ISRA. Individual Defendants further admitted in the Verified Complaint that remediation costs for Fayetteville Works alone would greatly exceed $60 million, which was the minimum required amount to end future Fluoroproducts emissions (in addition to the substantial costs required to clean up the decades of emissions that had already occurred).

90.     The Form 10-Q also repeated the statements above, stating that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities. This statement and omission were false and misleading for the reasons explained above. Further, Chemours admitted in its Verified Complaint that by no later than 2018, DuPont had provided Chemours with the "comprehensive study" estimating the benzene liabilities "at over $111 million."

91.     Individual Defendants, well aware of the true exposure Chemours was facing, engaged in insider sales only days after filing the 10-Q. Defendants Vergnano and Newman each sold unusually large amounts of Chemours stock during the Relevant Period when they could maximize profits. Indeed, Defendants Vergnano and Newman sold over $10.1 million and $6.8 million in Chemours stock, respectively, during the Relevant Period, yet they didn't sell any shares prior to Relevant Period.

92.     On May 8 and 9, 2018, Defendant Vergnano sold over $10.1 million worth of Chemours stock, while Defendant Newman sold $2.2 million worth. These sales were timed to

maximize insider profits, as they were made shortly after those Defendants became aware of internal estimates of approximately $2 billion in Chemours liabilities. Significantly, after the trading plans served their purpose of "allowing" Defendants' massive stock dumping in May 2018, Defendants abandoned the trading plans. Further, Newman's other Relevant Period stock sales were not pursuant to any trading plan. The sales were timed right when the Company's stock was trading near its highest at $50.86 per share, and right before the stock plummeted following revelation of news regarding the environmental liabilities.

93.     On August 3, 2018, Individual Defendants held their second quarter earnings call for 2018, reporting $497 million in adjusted EBIDTA and $281 million in net income. During the call, Defendant Newman said "we continue to enhance our liquidity while adding flexibility to [Chemours'] balance sheet," and that the Company "continued to benefit from the flexibility that our balance sheet provides."

94.     On the same day, Individual Defendants filed with the SEC Chemours' Form 10-Q for Q2 2018. In it, Individual Defendants reported a total environmental remediation accrual of only $247 million, which Individual Defendants said was "appropriate based on existing facts and circumstances," and further stated that, "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $500 [million] above the [$247 million] amount accrued." The Form 10-Q also said that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations, or cash flows in any given year, as such obligation can be satisfied or settled over many years."

95.     These statements were materially false and misleading. In truth, Defendants had not "add[ed] flexibility" to the Company's balance sheet. Rather, as Defendants have now admitted

in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far exceeded the Company's net assets and rendered it insolvent as a matter of law at the time of the spin-off and throughout the Relevant Period. In light of these facts, Individual Defendants' assertion that their reserve of only $247 million was "appropriate based on existing facts and circumstances" was clearly false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $747 million) was false.

96.     Individual Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also demonstrably false. In the Verified Complaint, Defendants admitted that they were unequivocally told by DuPont prior to the Relevant Period that remediation costs for Chemours' New Jersey sites alone would be $337 million, and during the Relevant Period, $620 million, very material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Moreover, Chemours itself asserted that DuPont's $620 million estimate was " implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion, an amount that was required to be posted immediately under ISRA. Additionally, by this time, Individual Defendants had received an upward estimate of "maximum" liability from DuPont of remediation across all New Jersey sites of $620 million, which Individual Defendants asserted in the Verified Complaint was "implausib[ly]" low. Defendants further admitted in the Verified Complaint that remediation costs for Fayetteville Works alone would greatly exceed $60 million, which was the minimum required amount to end future Fluoroproducts pollution. By spring of 2018, Individual Defendants were provided with a comprehensive environmental remediation liability analysis that calculated the Company faced no

less than $2 billion in existing remediation costs across all Company sites (excluding any related litigation).

97.     The Form 10-Q also repeated the statements above, stating that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities. This statement and omission were false and misleading for the reasons explained above.

98.     On November 2, 2018, Defendants held their earnings call for the third quarter of 2018, reporting adjusted EBITDA of $435 million and net income of $275 million. Defendant Newman boasted about the "profitability of our business," and stated that the Company had reduced its net leverage ratio again, to 1.5x. Defendant Newman further stated that "[w]e continue to believe that our balance sheet affords us ample strategic flexibility in each of our 3 businesses and the ability to manage through any broader economic cycle."

99.     The same day, Individual Defendants filed with the SEC Chemours' Form 10-Q for Q3 2018. In it, Individual Defendants reported a total environmental remediation accrual of just $239 million, which Defendants stated was "appropriate based on existing facts and circumstances," and further stated that, "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $470 million above the [$239 million] amount accrued." The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash flows in any given year, as such obligation can be satisfied or settled over many years."

100.    The statements quoted above was materially false and misleading for the reasons explained above. In truth, the Company had not achieved "profitability," nor did it have "ample

strategic flexibility" on its balance sheet. The exact opposite was true. As Defendants have now admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law at the time of the spin-off and throughout the Relevant Period. In light of these facts, Defendants' assertion that their reserve of only $239 million was "appropriate based on existing facts and circumstances" was false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $709 million) bore no relation to reality.

101.    Individual Defendants' statement rejecting the possibility of any "material impact" on the Company from remediation activities with respect to "any individual site" was also demonstrably false. In the Verified Complaint, Defendants admitted that they were unequivocally told by DuPont prior to the Relevant Period that remediation costs for Chemours' New Jersey sites alone would be $337 million, and during the Relevant Period, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Moreover, Chemours itself asserted that DuPont's $620 million estimate was " implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA. Defendants further admitted in the Verified Complaint that remediation costs for Fayetteville Works alone would greatly exceed $60 million, which was the minimum required amount to end future Fluoroproducts emissions (in addition to the substantial costs required to clean up the decades of emissions that had already occurred). By spring of 2018, Individual Defendants had been provided with a comprehensive environmental remediation liability analysis that calculated the Company faced no less than $2 billion in existing remediation costs across all

Company sites (excluding any related litigation).

102.    The Form 10-Q also reported a total litigation accrual for PFOA of only $20 million, with no accrual at all for Fluoroproducts litigation, and stated that, "while management believes it is reasonably possible that Chemours could incur losses in excess of the amounts accrued, if any, for the [proceedings regarding which Chemours was obligated to indemnify DuPont], it does not believe any such loss would have a material impact on the Company's consolidated financial position, results of operations, or cash flows."

103.    The statements quoted above above were materially false and misleading. Indeed, this was the first time during the Relevant Period that Defendants had expressly claimed in their public filings that PFOA and Fluoroproducts litigation would have no "material impact" on the Company's financials. However, the exact opposite was true. PFOA litigation had only increased during the Relevant Period, amounting to 60 cases that were filed by the end of 2018 claiming up to $120 million in personal injury damages. Considering that just one of these actions resulted in a $50 million verdict against Chemours, this litigation clearly was a material threat to the Company. Further, as Individual Defendants admitted in the Verified Complaint, Fluoroproducts litigation was "proliferating" across the country during this time, including by civil litigants and governmental authorities. Indeed, DuPont had given Chemours a precise estimate for this liability of $194 million at the time of the spinoff, which was itself highly material (equaling the Company's average net quarterly income during the Relevant Period), that Chemours admitted in the Verified Complaint vastly understated the Fluoroproducts liability risk it actually faced.

104.    The Form 10-Q also repeated the statements above, stating that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities. This statement and omission were false and misleading for the

reasons explained above.

105.    On January 7, 2019, Defendant Vergnano spoke at the Delaware State Chamber of Commerce Annual Dinner. Standing in front of a presentation slide titled "Early on, more than a few chattering pundits and prognosticators left Chemours for dead," Vergnano proclaimed that any allegations about the Company's dire financial situation were not true:

> Not too long into our life as a publicly traded company, a number of business journalists and financial writers left us for dead. Some proclaim that we were absolutely set up to fail. Chemours was born in the summer of 2015, a spin-off of DuPont's performance chemicals business, as many of you here tonight know. Did we have a tough slog ahead? You bet. Were we set up to fail? No way.

106.    Vergnano then boasted about the Company's remarkable "transformation" and "turnaround." Vergnano stressed that Chemours successfully executed a "5- point transformation plan" resulting in a turnaround that was "nothing short of remarkable," including "tripled" adjusted earnings, reduced leverage from "8 times levered to below 2 times levered from a debt perspective," and a shareholder return "of over 127% in the last fiscal year."

107.    Vergnano's statements above were materially false and misleading. Defendant Vergnano's denial that "no way" had Chemours been "set up to fail" is directly contradicted by Chemours' admission in the Verified Complaint that Chemours was actually set up to fail. As Chemours' said, "DuPont orchestrated a spin-off … as part of a plan to try to off-load its historical environmental liabilities" by "dump[ing]" the "maximum possible environmental liability" into Chemours—such that DuPont had rendered Chemours insolvent in violation of Delaware law. Further, rather than "transforming" Chemours' financial condition and executing a financial "turnaround" that was "nothing short of remarkable," the Company was in fact readying its confidential lawsuit against DuPont that was premised on Chemours' continued and deepening insolvency. The lawsuit was filed (under seal) less than six months after Vergnano's speech.

Indeed, as DuPont asserted in its motion to dismiss the Verified Complaint, despite revealing that it was insolvent from the time of the spinoff in its sworn pleading, "Chemours [told] a strikingly different story to the SEC and the investing public [in which] [it] regularly promote[d] itself as a spin off success."

108.    On February 15, 2019, Individual Defendants had their earnings call for the fourth quarter and full year 2018, reporting annual adjusted EBIDTA of $1.7 billion and net income of $995 million. During the call, Defendant Vergnano outlined "[t]he strength of our balance sheet," which "affords us the ability to invest in our company while continuing to return significant cash to shareholders through our share repurchase authorization and dividends."

109.    Defendant Newman said that the Company's net leverage ratio continued to be low at approximately 1.6x, and asserted that "[w]e believe that our de-risked balance sheet gives us the ability to execute our strategy through any potential economic cycle, while returning the majority of our free cash flow to shareholders."

110.    On the same day, Individual Defendants filed with the SEC Chemours' Form 10-K for 2018. Despite the fact that Chemours was just three short months from filing its suit against DuPont in which it disclosed for the first time that it faced billions of dollars in environmental liabilities that rendered it insolvent, Chemours reported both dramatically reduced environmental liabilities and alleged "maximum liability" figures. Indeed, in that filing, Chemours reported accruals for environmental remediation of only $226 million, a reduction of more than 10% from the $253 million it had accrued in its 2017 Form 10-K and a reduction of almost 20% from the accrual set forth in its 2016 Form 10-K. Similarly, the Company stated that its "remote" maximum liability above that accrual would only be $450 million—a reduction of almost 12% from the $510 million the Company reported in the 2017 Form 10-K. The Form 10-Q also stated that

"[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash flows at any given year, as such obligation can be satisfied or settled over many years."

111.    The statements above were materially false and misleading. In truth, the Company's balance sheet was not "strong" or "de- risked." To the contrary, as Individual Defendants admitted in the Verified Complaint, Chemours' environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far exceeded the Company's net assets and rendered it insolvent as a matter of law at the time of the spin-off and throughout the Relevant Period. In light of these facts, Defendants' assertion that their reserve of only $226 million was "appropriate based on existing facts and circumstances" was false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $676 million) bore no relation to reality.

112.    Defendants' statement rejecting the possibility of any "material impact" on the Company from remediation activities with respect to "any individual site" was also demonstrably false. In the Verified Complaint, Defendants admitted that they were unequivocally told by DuPont prior to the Relevant Period that remediation costs for Chemours' New Jersey sites alone would be $337 million, and during the Relevant Period, $620 million, highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Moreover, Chemours itself asserted that DuPont's $620 million estimate was " implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA. Moreover, by this time, as Defendants admitted in the Verified Complaint, Defendants had

entered or were about to enter into the consent order with the North Carolina Department of Environmental Quality ("NC DEQ") requiring them to spend in excess of $200 million to remediate Fayetteville Works. By Spring 2018, Individual Defendants had been provided with a comprehensive environmental remediation liability analysis that calculated the Company faced no less than $2 billion in existing remediation costs across all Company sites (excluding any related litigation).

113.    The Form 10-K also reported a litigation accrual for PFOA of just $22 million, with no litigation accrual at all for other types of Fluoroproducts, and stated that, "while management believes it is reasonably possible that Chemours could incur losses in excess of the amounts accrued, if any, for the [proceedings regarding which Chemours was obligated to indemnify DuPont], it does not believe any such loss would have a material impact on Chemours' consolidated financial position, results of operations, or cash flows."

114.    The statements above regarding the Company's PFOA and Fluoroproducts litigation would have no "material impact" on the Company's financials were materially false and misleading, as this litigation did pose a huge material impact. Indeed, PFOA litigation had only increased during the Relevant Period, amounting to 60 cases that were filed by the end of 2018 claiming up to $120 million in personal injury damages. Considering that just one of these actions resulted in a $50 million verdict against Chemours, this litigation was a material threat to the Company. Further, as Individual Defendants admitted in the Verified Complaint, Fluoroproducts litigation was also quickly "proliferating" across the country during this time.  Indeed, DuPont had given Chemours a precise estimate for this liability of $194 million at the time of the spinoff, which was itself highly material (equaling the Company's average net quarterly income during the Relevant Period), that Chemours admitted in the Verified Complaint vastly understated the

Fluoroproducts liability risk it actually faced.

115.    The Form 10-K repeated the statements above, stating that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities. This statement and omission were false and misleading for the reasons explained  above.

116.    With respect to GenX, the Form 10-K stated that "[t]he Company believes that discharges to the Cape Fear River, site surface water, groundwater, and air emissions have not impacted the safety of drinking water in North Carolina." This statement was false and misleading for the reasons explained above.

117.    On May 3, 2019, only ten days before Individual Defendants filed the Verified Complaint in the Delaware Court of Chancery, Individual Defendants held their first quarter earnings call for 2019, reporting adjusted EBITDA of $262 million and net income of $94 million.

118.    Defendant Newman said, "[w]ith a strong balance sheet heading into 2019, we were able to opportunistically execute on our share repurchase program, fund the working capital needs of the business and execute strategic investments."

119.    The same day, Individual Defendants filed with the SEC Chemours' Form 10-Q for Q1 2019. In it, Defendants reported a total environmental remediation accrual of just $233 million, which Defendants stated was "appropriate based on existing facts and circumstances," and further stated that, "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $450 million above the [$233 million] amount accrued." The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash flows for any given year, as such obligation can

be satisfied or settled over many years."

120.    The statements above were materially false and misleading. In truth, the Company did not have a "strong balance sheet heading into 2019." Rather, as Individual Defendants would admit in the Verified Complaint only ten days later, Chemours' environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law at the time of the spin-off and throughout the Relevant Period. In light of these facts, Defendants' assertion that their reserve of only $233 million was "appropriate based on existing facts and circumstances" was false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $683 million) were untrue and misleading.

121.    Individual Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also demonstrably false. In the Verified Complaint, Defendants admitted that they were unequivocally told by DuPont prior to the Relevant Period that remediation costs for Chemours' New Jersey sites alone would be $337 million, and during the Relevant Period, $620 million, material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Moreover, Chemours itself asserted that DuPont's $620 million estimate was " implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA. Moreover, by this time, and as Individual Defendants admitted in the Verified Complaint, Individual Defendants had entered or were about to enter into the consent order with NC DEQ requiring them to spend in excess of $200 million to remediate Fayetteville Works. By Spring 2018, Individual Defendants had been provided with a comprehensive environmental remediation

liability analysis that calculated the Company faced no less than $2 billion in existing remediation costs across all Company sites (excluding any related litigation).

122.    The Form 10-Q also reported a litigation accrual for PFOA of just $22 million, with no litigation accrual at all for Fluoroproducts, and stated that, "while management believes it is reasonably possible that Chemours could incur losses in excess of the amounts accrued, if any, for the [proceedings regarding which Chemours was obligated to indemnify DuPont], it does not believe any such loss would have a material impact on the Company's consolidated financial position, results of operations, or cash flows."

123.    The statements above regarding the Company's PFOA and Fluoroproducts litigation having no "material impact" on the Company's financials were materially false and misleading. The exact opposite was true. Indeed, PFOA litigation had only increased during the Relevant Period and amounted to 60 cases that were filed by the end of 2018 claiming up to $120 million in personal injury damages. Considering that just one of these actions resulted in a $50 million verdict against Chemours, this litigation clearly posed a material threat to the Company. Moreover, as Defendants admitted in the Verified Complaint, Fluoroproducts litigation was also quickly "proliferating" across the country during this time.  Indeed, DuPont had given Chemours a precise estimate for this liability of $194 million at the time of the spinoff, which was itself highly material (equaling the Company's average net quarterly income during the Relevant Period). Chemours vastly understated the Fluoroproducts liability risk it actually faced.

124.    The Form 10-Q also repeated the statements above and stated that "a range of ... losses [for benzene litigation] cannot be reasonably estimated" while refusing to report any amount of liability for the benzene liabilities. This statement and omission were false and misleading for the reasons explained above.

125.     With respect to GenX, the Form 10-Q repeated the statement above and stated "[t]he Company believes that discharges to the Cape Fear River, site surface water, groundwater, and air emissions have not impacted the safety of drinking water in North Carolina." This statement was false and misleading for the reasons explained above.

126.     Defendants also misrepresented Chemours' liability for several lawsuits filed by the NJ DEP in March 2019. The Form 10-Q did not report any accruals for liabilities relating to these actions and said that while a loss was possible, it was "not estimable." This statement was false and misleading. As Individual Defendants admitted in the Verified Complaint, Chemours was aware of estimates by DuPont that its environmental liabilities in New Jersey would be approximately $620 million, a figure Individual Defendants admitted was, as New Jersey had stated, "implausib[ly]" low. Furthermore, Chemours admitted in its Verified Complaint that New Jersey's lawsuits threatened the Company with "staggeringly expensive" costs well into the "hundreds of millions of dollars."

127.     Significantly, less than two months before the 10-Q was filed, Defendant Newman engaged in further sales on March 11, 2019. On that date, at near-term highs, Newman sold the most shares he had ever sold.

128.     Each of Chemours' Forms 10-K and 10-Q filed during the Relevant Period represented that the Company's financial statements were "prepared in accordance" with GAAP and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Defendants Vergnano and Newman. The SOX Certifications assured investors that the subject Form 10-K or 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." The SOX Certifications also stated that "the financial

statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows," of Chemours. Furthermore, the SOX Certifications stated that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

129.   Each of the SOX Certifications quoted above were materially false and misleading for the reasons explained above.

**The Truth Starts to be Revealed to Investors Regarding Chemours Massive Environmental Liabilities**

130.   On May 6, 2019, the truth began to emerge. That day, the Sohn Investment Conference was held in New York City. During the conference, Larry Robbins of Glenview Capital Management, a prominent hedge fund founded in 2000 with approximately $7.7 billion in assets under management, gave a detailed presentation during which he revealed previously undisclosed information about the true liabilities that Chemours was facing as a result of increasing Fluoroproducts litigation exposure.

131.   In his presentation, Robbins stated that Chemours had hugely understated the environmental liabilities it was facing, highlighting that Chemours, DuPont and other manufacturers of Fluoroproducts had known about the contamination of drinking water supplies, and the decades of deadly human health effects that such contamination caused, but intentionally suppressed that information from the public. Robbins further highlighted the fact that Chemours was forced to indemnify DuPont for these liabilities, stating: "the liabilities are now Chemours'. Every time you see DuPont losing a suit, you should assume that that liability will stay with Chemours." As a result of his analyses, Robbins pointed out that, in reality, Chemours faced "$4 to 6 billion" in environmental liabilities, far greater than the Company's reserves, a massive amount that represented "60 to 100% of its market [capitalization]."

132.    On this news, Chemours' stock price plummeted over two trading days from $34.18 per share on Friday, May 3, 2019 to $29.09 per share on Tuesday, May 7, 2019, a decline of nearly 15% that wiped out over $830 million in the Company's market capitalization.

133.    In the days that followed, Individual Defendants strongly disputed Robbins' conclusions and sought to reassure the market regarding Chemours' environmental litigation liabilities. A May 15, 2019 SunTrust Robinson Humphrey report on Chemours provided "takeaways" from a meeting SunTrust had with Chemours' management "to discuss the company's exposure to PFAS": (i) PFOA was previously used by Chemours' former parent company, DuPont, but that "[u]sage was discontinued 3 years before the spin of CC"; (ii) Chemours' replacement for PFOA, GenX, "is manufactured and recycled at the Fayetteville site in accordance with an EPA consent order"; (iii) the Company saw "limited litigation risk related to GenX, and believes it is adequately reserved for any potential liabilities"; and (iv) Chemours was pursuing litigation regarding the Company's separation agreement with DuPont, but that "lawsuit is unrelated to PFAS." In light of Individual Defendants' reassurances, SunTrust concluded: "Given the lack of specific legal claims against CC regarding PFAS and the company's proactive stance toward . . . eliminating GenX emissions from its facilities, we believe the concerns about PFAS-related liabilities are premature."

134.    Conflictingly, at the same time Individual Defendants were strongly denying the Glenview Capital Management report, they filed the Verified Complaint on May 13, 2019. Aware that the information contained therein would directly contradict Individual Defendants' denials, they filed the complaint under seal. However, on June 28, 2019, the Delaware Court of Chancery ordered the unsealing of the Verified Complaint against DuPont.

135.    The Verified Complaint contained a series of surprising admissions by Chemours,

including that, contrary to its public pronouncements that the Company was adequately reserved and that there was only a "remote" chance of incurring liability above its accruals, the Company actually faced nearly inevitable environmental liabilities of approximately $2.5 billion, and this figure was conservative.

136.    The Verified Complaint included remarkable admissions (in light of Individual Defendants deceptive denials just two days prior to its filing) that Chemours was insolvent from its inception, with liabilities far outstripping its assets, which only increased as the Relevant Period progressed, and liability exposures solidified and expanded. The Verified Complaint admitted that the environmental liabilities that Chemours assumed through the spin-off were so large that it had been set up to fail from the beginning and was legally insolvent as a matter of "Delaware General Corporation Law, common law and public policy." Indeed, the Verified Complaint outlined how the "maximum" liability estimates that were used by DuPont to support the spin-off under Delaware law were "routine and radical understatements" and "systematically and spectacularly wrong," to the point that the "entire spin-off process was a sham."

137.    The Verified Complaint individually addressed four specific categories of liabilities that showed Chemours' insolvency at all relevant times during the Relevant Period: (1) PFOA-related litigation; (2) North Carolina environmental liabilities; (3) New Jersey environmental liabilities; and (4) Benzene and Fluoroproducts litigation liabilities. The Verified Complaint described the "staggering" liabilities facing the Company for each category of liability, detailed how DuPont's initial estimates for each category were "baseless" and "miniscule," and how even the upwardly-revised estimates were "implausible" and "not good- faith estimates." The Verified Complaint specifically identified "over $1 billion" in remediation and litigation liabilities for just one New Jersey site, "more than $200 million" of remediation costs in North Carolina, "over $111

million" in benzene litigation liabilities, and in excess of "$194 million" in Fluoroproducts litigation liabilities.

138.    With regard to the Company's redacting of virtually the whole complaint, Chancellor Glasscock held a call in which he noted that this treatment "can't be a good-faith compliance with the rule," and issued a Bench Ruling finding that Chemours had "failed to comply with Court of Chancery Rule 5.1 in the redaction of confidential information in the Complaint," but "[d]eferred unsealing of the complaint first giving counsel an opportunity to file either an Interlocutory Appeal or a Motion for Reargument." On June 6, 2019, Chemours filed a Motion for Confidential Treatment seeking to file the complaint under seal, which Vice Chancellor Glasscock denied the following day. On June 26, 2019, the Supreme Court of Delaware refused DuPont's application for interlocutory appeal. As a result, the Verified Complaint was unsealed on June 28, 2019.

139.    Subsequent proceedings in the litigation further highlighted Individual Defendants' violations of the federal securities laws. For instance, in DuPont's September 13, 2019 Motion to Dismiss the Verified Complaint in favor of arbitration mandated by the Separation Agreement, DuPont made clear that Chemours' admissions in the Verified Complaint directly contradicted its assurances to investors throughout the Relevant Period, emphasizing that "Chemours has been telling a strikingly different story to the SEC and the investing public [in which] Chemours regularly promotes itself as a spin-off success." In a subsequent reply brief, DuPont again highlighted this contradiction, noting that "in none of its SEC filings has Chemours ever mentioned any supposed insolvency," and "contrary to what Chemours now alleges, [the Company] reassured investors about its environmental liabilities: Our environmental liabilities are well understood and well managed."

140.    In its October 18, 2019 opposition to DuPont's motion, Chemours reiterated the allegations that it made in the Verified Complaint, including that DuPont's "maximum" liability estimates were "systematically and spectacularly wrong" from the get-go, asserting that "[n]o reasonable person could have believed in good faith that these reserves actually reflected Chemours' likely maximum exposure." As a result, Chemours admitted that these liabilities rendered the Company "insolvent at the time of the spin-off."

141.    Thereafter, during a December 18, 2019 hearing, counsel for Chemours reiterated that DuPont's "maximum" liability estimates "necessarily and radically undercounted the liability being assigned to [Chemours]," and that it was "astonishing, breathtaking, the extent to which these certified maximum liability estimates have proved wrong . . . not by a little bit," but by "many hundreds of millions of dollars." Chemours' counsel concluded that these facts "can only lead to an inference of bad faith, because [the liability maximums] were just manifestly evidently designed to undercount the liability hugely; and that they did, in fact, undercount the liability hugely . . . and that, [as a] consequence, [Chemours] was not solvent at the time it was spun."

142.    Significantly, Chemours' counsel openly admitted that the true exposure the Company was facing was substantially larger than even the $2.5 billion figure referenced in the Verified Complaint, noting: "[a]nd we're just four years out. We're nowhere near the maximum here." Counsel also confirmed in no uncertain terms that Chemours had "been objecting to the interpretation of these estimated liability maximums for four years," thereby establishing that (i) Individual Defendants were fully aware of these facts throughout the Relevant Period; (ii) the liabilities had not improved but in fact had only worsened in the four years since the spin-off; and (iii) the same exact issues that rendered Chemours insolvent at the time of the spin-off still exist today. Accordingly, at the same time that Individual Defendants were publicly touting Chemours'

limited liabilities, Individual Defendants were privately acknowledging the true extent of those liabilities to DuPont. The litigation against DuPont represented an open acknowledgment that the Company's time was running out in its efforts to hide its enormous environmental liabilities.

143.    In sum, Chemours' contradictory filing admitted the Company was insolvent, with "virtually no cushion for liquidity, necessary capital expenditures or adverse developments" from the moment the spin-off was consummated. It had only kept its head above water during the Relevant Period by materially misleading investors about the true size of its liabilities.

144.    In response to these disclosures, Chemours' stock price fell nearly 15%, from $24.90 per share on June 27, 2019 to $21.17 per share on July 2, 2019, losing over $610 million in market capitalization.

145.    In a statement released to reporters following the unsealing of the Verified Complaint, Chemours stated: "Chemours believes the legal action we have taken in Delaware Chancery Court is in the best interest of all Chemours stakeholders. From its inception, Chemours moved quickly and with urgency to transform the company and take action to address historic issues. The language in the lawsuits speaks for itself and we will not comment further on pending litigation."

Despite Chemours' assurance that the legal action was "in the best interest of all Chemours stakeholders," analysts were shocked by Individual Defendants' admission that the Company had vastly understated the magnitude of its liabilities by no less than $2.5 billion. A July 8, 2019 SunTrust report stated "[w]e are lowering our price target on CC from $52 to $36 to account for an upwardly revised estimate of potential legacy environmental liabilities stemming from [PFAS]." The report continued: "[i]n a recent court filing, CC quantified potential high-end liabilities of approximately $2.5B, meaning that the Company's exposure was "materially higher

than expected" with many more liabilities remaining that had not yet been quantified. Moreover, the report suggested that the $2.5 billion estimate was likely highly conservative, representing only liabilities that the Company had chosen to specifically quantify—indeed, the report estimated that the Company's "current valuation of 4.1 X 2020 EBITDA assumes exposure of ~$5.5 billion, or more than 2x the upper end of what CC has been able to estimate."

**Individual Defendants are forced to Reveal the Full Extent Of Chemours' True Environmental Liabilities**

146.     On August 1, 2019, Chemours reported its second quarter results and abruptly lowered its full-year guidance, dramatically reducing its full-year free cash flow outlook from prior guidance of over $550 million to only $100 million, indicating that, rather than a "strong," "solid," or "flexible" balance sheet with ample room to deal with future liabilities, the Company had virtually no liquidity cushion to speak of. When the Company filed its Form 10-Q the same day, Chemours further disclosed significant increases in its estimated environmental liabilities, including over a dozen new legal and regulatory actions related to Fluoroproducts.

147.     On this news, Chemours shares dropped from $18.16 per share on August 1, 2019 to $14.69 on August 2, 2019 on unusually high trading volume, a 19% decline that wiped out another $560 million in market capitalization.

148.     Analysts reacted negatively again and specifically tied the Company's poor financial results and diminishing value to its environmental liabilities. For example, on August 1, 2019, Barclays issued a report stating that Chemours' financial results had been heavily impacted by its rising liabilities, commenting that Fluoroproducts liability was the "more significant issue in our mind" and "the only credible risk to [Chemours'] intrinsic value." Similarly, an August 5, 2019 SunTrust report downgraded Chemours' stock from "buy" to "hold," cutting its target price

my more than half from $36 to $16 per share, due to "worst case environmental liability scenarios as accruals for remediation and litigation continue to rise." SunTrust noted again that the Verified Complaint had "detail[ed] materially higher potential exposures under multiple lawsuits since the spin," amounting to "~2.5B of maximum liability" even after the Ohio MDL settlement was paid out with "several active legal cases" still pending. The report further stated that "investors are likely to presume that max environmental liabilities are roughly equivalent to the $4B dividend paid to DuPont, which CC seeks to recoup in its lawsuit." On the same day, Barclays issued a report stating that "PFAS liability" represented a "significant liability" for Chemours, adding that "we believe the market will continue to discount ~2.5bn [for environmental liabilities] for the foreseeable future."

> A November 4, 2019 Bloomberg article called "'Forever Chemicals' Legacy Weighs on Chemours' Future" cited John Inch, an analyst with the market research firm Gordon Haskett Research Advisors LLC, who calculated that Chemours "may have to pay more than $160 billion over the next two to three decades, with roughly half of that coming from environmental remediation," over 67 times its current market capitalization.**Additional Litigations, Federal Legislation, and the DOJ Criminal Investigation Of Chemours**

149.    On January 10, 2020, the House of Representatives passed H.R. 535, the PFAS Action Act, which required the EPA to designate PFOA and related Fluoroproduct chemicals as hazardous substances under the Superfund law and directed the EPA to create limits for PFOA and PFOS in drinking water within two years. In a press release the same day, the House highlighted that the act "stem[s] the tide of further contamination with tough new testing, reporting and monitoring requirements; strict[ly] limits [] the introduction of new PFAS chemicals; [puts] limits on air emission and ban[s] unsafe incineration; [and implements] strong measures to hold

contaminating companies accountable." A September 30, 2019 Bloomberg article noted that "if the bill … were signed into law, it would trigger mandatory cleanups and, in some cases, force manufacturers to foot the bill."

150.    Fluoroproducts-related federal investigations have continued. On February 14, 2020, the Company filed its annual report on Form 10-K with the SEC. The 2019 10-K disclosed that, in January 2020, the Department of Justice and United States Attorney's Office for the Eastern District of Pennsylvania had informed the Company that they were considering initiating a criminal investigation of Chemours under the Federal Food, Drug and Cosmetic Act concerning Fluoroproducts exposure. The 2019 10-K declined to estimate a range of possible losses stemming therefrom.

151.    The 2019 10-K also disclosed that, on January 14, 2020, the Michigan Attorney General had joined other states in filing Fluoroproducts-related litigation against Chemours. The complaint claimed that Chemours and other defendant companies, including DuPont, "manufactured and used PFAS with full knowledge of PFAS health and environmental risks, which they intentionally hid from the public and the State." Michigan is seeking "[c]ompensatory damages arising from PFAS contamination and injury of State natural resources and property," including the costs related to: investigating, monitoring, "installing and maintaining an early warning system to detect PFAS," "remediating PFAS from natural resources," and "remediating PFAS contamination at release sites."

152.    On February 20, 2020, the EPA announced that, pursuant to its PFAS Action Plan ("Action Plan") of February 2019, it would set legal limits for Fluoroproducts in drinking water nationwide. The EPA also updated the Action Plan to state that it "has multiple criminal investigations underway concerning PFAS-related pollution."

153.    Accordingly, the repercussions of Individual Defendants' fraudulent concealment of the Company's environmental risks and liabilities had been devastating for the Company and its investors, and the resulting liabilities will continue to grow for many years to come. Chemours' financial results have been massively impacted by this deception, and investors have suffered substantial damages as a result.

**The False and Misleading Proxies**

154.    During the Relevant Period, on March 13, 2017, March 16, 2018, March 14, 2019 and March 13, 2020 the Company filed Schedule 14a forms with the SEC, which contained notices of shareholder meeting (by order of the Board) and Proxy Statements (together, "the Proxies").

155.    Each of the Proxies included statements as follows:

The Code of Conduct applies to all directors, officers (including the CEO, CFO and Controller) and employees of Chemours, and it sets forth the Company's policies and expectations on a number of topics including avoiding conflicts of interest, confidentiality, insider trading, protection of Chemours and customer property, and providing a proper and professional work environment. The Code of Conduct sets forth a worldwide toll-free and Internet-based ethics hotline, which employees can use to communicate any ethics-related concerns, and we provide training on ethics and compliance topics for employees.

The Code of Business Conduct and Ethics for the Board of Directors applies to all directors, and is intended to (i) foster the highest ethical standards and integrity; (ii) focus the Board and each director on areas of potential ethical risk and conflicts of interest; (iii) guide directors in recognizing and dealing with ethical issues; (iv) establish reporting mechanisms; and (v) promote a culture of honesty and accountability.

156.    Second, the Proxies each referred to the "Report of the Audit Committee." In it, the Company stated, for each fiscal year, during the Relevant Period:

The Audit Committee is appointed by the Board of Directors to assist the Board in the oversight of  (i) the integrity of the financial statements of the Company, (ii) the qualifications and independence of the Company's independent auditor, (iii) the performance of the Company's internal audit function and independent auditors, and (iv) the compliance by the Company with legal and regulatory requirements. All members of the Audit Committee meet the criteria for independence applicable to audit committee members under NYSE Listing Standards and the rules and

regulations of the SEC relating to audit committees. The Audit Committee Charter complies with NYSE Listing Standards.

Management is responsible for the financial reporting process, including its internal control over financial reporting, and for the preparation of its consolidated financial statements in accordance with accounting principles generally accepted in the United States ("GAAP").

Based on the review and discussions noted above, the Audit Committee recommended to the Board that the audited financial statements of the Company be included in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission.

157.    The Proxies were false and misleading because, while they assured investors that Chemours's code of business conduct and its audit committee's legal disclosure obligations were followed, during each fiscal year, the omissions and non-disclosures during the Relevant Period, as outlined herein, demonstrated that the Individual Defendants did not comply with the stated provisions of those documents when filing public statements regarding the affairs of the Company with the SEC.

## **FIDUCIARY DUTIES**

158.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Chemours and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Chemours in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Chemours and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

159.    Each Individual Defendant owes and continues to owe Chemours, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

160. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Chemours, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Chemours, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

161. To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

    (a)    ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

    (b)    conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

    (c)    remain informed as to how Chemours conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

    (d)    truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

162. The Individual Defendants, as officers and/or directors of Chemours, were bound

by the Company's Code of Business Conduct[1] (the "Code of Conduct") which required the

following:

> Unshakable integrity. It's one of our five values, and, like all of them, they are words to work by, to live by. The Chemours Code of Conduct is our guide to conducting business honorably, and Chemours thrives because our talented people are empowered to make things happen. It's how we distinguish ourselves among our customers; it's how we deliver to our shareholders; it's how we grow.
>
> ***
>
> In addition to avoiding situations that could put us at risk, we follow these principles to demonstrate our commitment to ethical business practices:
>
> • Our books and records accurately reflect the value and nature of all transactions.
> • We regularly evaluate business partners and stop working with them if we suspect corrupt practices.
>
> We may have access to nonpublic information ("inside information") about Chemours that could affect the value of Chemours or other companies' securities. Trading in Chemours securities when we have inside information or sharing inside information with others can be illegal and result in severe individual penalties.
>
> ***
>
> •We do not trade Chemours securities or the securities of any other company based on inside information.
>
> We keep accurate records because it is good business practice and also because good records reinforce other ethical behaviors. That's why at Chemours, we ensure our financial and nonfinancial information is recorded promptly, accurately, and securely.
>
> • Our records—including time records, expense reports, invoices, financial entries, benefit claims, and safety records—are carefully reviewed, authorized, recorded, and reported.
> • We ensure that all records accurately and fairly reflect the underlying transaction.
> • We follow our internal record-keeping policies to ensure that transactions are recorded accurately and promptly, and are supported by all necessary documentation.
> • We follow the law and our retention policies when producing, storing, or destroying records and documents.
> • We get the necessary Chemours approvals when responding to requests for information from a government or regulatory agency.

---

[1] See Chemours Code of Conduct:
https://s21.q4cdn.com/411213655/files/doc_downloads/governance_document/code-of-conduct-en-us.pdf

When keeping records, we do not:
• Make false or misleading entries
• Omit or conceal payment amount or purpose
• Keep undisclosed or unrecorded funds, accounts, or assets
• Knowingly allow illegal activities to occur

163.    In addition to these duties, the Audit Committee Defendants, who served on the Audit Committee during the Relevant Period, owed specific duties to Chemours under the Audit Committee Charter (the "Audit Charter").[2] Specifically the Audit Charter provided for the following responsibilities of the Audit Committee Defendants to:

> assist the Board in the oversight of (i) the integrity of the financial statements of the Company, (ii) the qualifications and independence of the Company's independent auditor, (iii) the performance of the Company's internal audit function and independent auditors (iv) the compliance by the Company with legal and regulatory requirements. The Committee shall also prepare the report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.
>
> ***
>
> Discuss the quarterly and annual financial statements and related footnotes of the Company and its subsidiaries with management and the independent auditor, as well as the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."
>
> In connection with the preparation of quarterly and annual financial statements of the Company and its subsidiaries and otherwise as is necessary, review, or as appropriate the Chair on behalf of the Committee shall review, with the independent auditor and management on a timely basis any matters appropriate or required to be discussed by applicable accounting and auditing professional standards or applicable regulations. These discussions shall include, as appropriate, any significant financial reporting issues; judgments about the quality and acceptability of accounting principles as applied to the Company's financial reporting, including the receipt from the independent auditor of a report on alternative treatments of financial information within generally accepted accounting principles discussed with management, the ramifications of such alternatives, and the treatment preferred by the independent auditor; the reasonableness of significant judgments made in connection with the preparation of the Company's financial statements and the clarity of the disclosures therein and any analyses prepared by management or the

---

[2] See Chemours Audit Committee Charter at:
https://s21.q4cdn.com/411213655/files/doc_downloads/governance_document/2019/Chemours-Audit-Committee-Charter-Approved-2.13.2019.pdf

independent auditor with respect thereto; the effect of regulatory and accounting initiatives and off-balance sheet structures on the Company's financial statements; and the adequacy of the Company's internal controls and the internal auditor's response thereto. Recommend to the Board whether to include the audited financial statements in the Company's Form 10-K.

Discuss generally earnings press releases and the financial information and any earnings guidance provided to the Company's analysts and rating agencies, as well as the disclosure of any "pro forma" or "non-GAAP" information.

Review both the acceptability and quality of major changes to the Company's accounting principles and practices as suggested by the independent auditor, Chief Audit Executive or management, and oversee the resolution of any disagreements between management and the independent auditor regarding financial reporting issues.

Discuss generally with management, the independent auditor and the Chief Audit Executive the selection, application and disclosure of critical accounting policies and estimates used by the Company.

Review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting, any fraud involving any employees who have a significant role in the Company's internal control over financial reporting, and any significant changes in internal controls over financial reporting or in other factors that could significantly affect internal controls over financial reporting, including any corrective actions with regard to significant deficiencies and material weaknesses.

Review and discuss with the independent auditor its assessment of the effectiveness of the Company's internal controls over financial reporting, whether any changes are necessary in light of such assessment, and the basis for its report on the Company's internal controls.

Review and discuss with management their assessment of the effectiveness of the Company's disclosure controls and procedures and whether any changes are necessary in light of such assessment.

Review with the General Counsel or the attorney(s) designated by the General Counsel any legal matters that may have a material impact on the financial statements.

Oversee the establishment of and monitor procedures for: (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting control or auditing matters; and (ii) the confidential, anonymous

submission by the employees of the Company of concerns regarding accounting or auditing matters.

## BREACHES OF DUTIES

164.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Chemours, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

165.    The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the extensive problems the Company was encountering in connection with the environmental liabilities it inherited from DuPont as part of its agreement with DuPont related to the Spin-Off. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Chemours substantial damage.

166.    The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The members of the Audit Committee breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Chemours's public statements and internal control function.

167.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Chemours, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of Individual

Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, Chemours has expended, and will continue to expend, significant sums of money.

## DAMAGES TO CHEMOURS

168.    The improper accounting practices have exposed the Company to myriad reputation and financial damages, including but not limited to:

(a)    Possible restatements and goodwill impairments;

(b)    Liability arising from the Securities Class Action;

(c)    The loss of credibility with customers and suppliers; and

(d)    Legal and accounting costs associated with litigation, investigations and restatements.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

169.    Plaintiff brings this action derivatively and for the benefit of Chemours to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Chemours, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

170.    Chemours is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

171.    Plaintiff is, and has been continuously at all relevant times, a stockholder of Chemours. Plaintiff will adequately and fairly represent the interests of Chemours in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

172.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if

fully set forth herein.

173.    A pre-suit demand on the Board of Chemours is futile and, therefore, excused. At the time of filing of this action, the Board consists of all of the Director Defendants. Plaintiff needs only to allege demand futility as a majority of the Directors who are on the Board at the time this action is commenced.

174.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, rendering them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

175.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

176.    Defendant Vergnano's employment with the Company as its President and Chief Executive Officer is his main source of employment, pursuant to which he has received and continues to receive his livelihood. Additionally, Defendant Vergnano is a named defendant in the Securities Class Action.

177.    Demand is excused against Defendants Vergnano, Anastasio, Bell, Brown, Cranston, Crawford, Farrell, and Keohane for reasons stated below.

178.    Although internally aware that remediation costs would approach at least $2 billion, Director Defendants hid these numbers by publicly disclosing other numbers which massively understated the Company's expected environmental remediation costs. Individual Defendants knew the Company accrued an average of $240 million for environmental remediation in 2018 which would cost at least $2 billion; thus, there was a massive understatement of approximately $1.8 billion. Moreover, Individual Defendants actually decreased their environmental remediation accruals as 2018 progressed.

179.    Defendants Vergnano, Anastasio, Bell, Brown, Cranston, Crawford, Farrell, and Keohane breached their fiduciary duties of due care, loyalty, and good faith because they authorized false and misleading statements to be disseminated in the Company's SEC filings and other disclosures when they were aware Chemours' environmental liabilities were in the billions of dollars and that their disclosures to the investing public about these figures was nowhere near true or accurate. Accordingly, Defendants Vergnano, Anastasio, Bell, Brown, Cranston, Crawford, Farrell, and Keohane face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

180.    The Audit Committee Defendants each face a substantial likelihood of liability for their failure to take steps to ensure the Company's regulatory compliance. The Audit Committee Charter specifically charges the members of the Audit Committee with ensuring the Company's compliance with legal and regulatory requirements and the Audit Committee Defendants violated their duties of loyalty and good faith by failing to take adequate steps to ensure such compliance.

181.    Defendants Vergnano, Newman, Brown, Anastasio, Bell, Cranston, Crawford and Farrell executed the false and misleading 2016 Form 10-K and 2017 Form 10-K and misrepresented the enormous environmental liabilities at those times. Defendants Vergnano,

Newman, Brown, Anastasio, Bell, Cranston, Crawford Farrell and Keohane executed the false and misleading statements in the 2018 Form 10-K.

182.   Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. During the Relevant Period, the Audit Committee Defendants failed to properly fulfil these duties and allowed the Company to issue false and misleading financial statements with the SEC. Accordingly, the Audit Committee Individual Defendants breached their fiduciary duties, they are not disinterested, and demand is excused against them.

183.   In violation of the Code of Conduct, the Director Defendants did not engage in proper oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, breaches of fiduciary duty, gross mismanagement, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

184.   Chemours has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Chemours any part of the damages Chemours suffered and will continue to suffer thereby. Thus,

any demand upon the Director Defendants would be futile.

185.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

186.   The acts complained of herein constitute violations of fiduciary duties owed by Chemours' officers and directors and are incapable of ratification.

**Insurance Considerations**

187.   The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Chemours. If there is a directors and officers' liability insurance policy covering the Relevant Period, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Chemours, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

188.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Chemours to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

189.    Thus, for all the reasons set forth above, all of the Director Defendants, and, if not all of them, at least a majority of Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants
*for Violations of Section 14(a) of the Exchange Act*

190.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

191.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations, reliance upon any allegation, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

192.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

193.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no

proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

194.    The Proxies stated that the Company's directors and employees, including its principal executive officer, principal financial officer, principal accounting officer, and controller, or persons performing similar functions, are subject to the Company's Code of Conduct. The Proxies were false and misleading because, despite assertions to the contrary, Chemours's compliance with its respective codes of conduct were not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

195.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

196.    The false and misleading elements of the Proxies led to the re-elections of all of the Director Individual Defendants, allowing them to continue breaching their fiduciary duties to Chemours.

197.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies

198.    Plaintiff on behalf of Chemours has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants

*for Violations of Section 20(a) of the Exchange Act*

199.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200.     The Individual Defendants, by virtue of their positions with Chemours and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Chemours and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Chemours to engage in the illegal conduct and practices complained of herein.

201.     Plaintiff on behalf of Chemours has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants**
*for Breach of Fiduciary Duties*

202.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Chemours's business and affairs.

204.     Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

205.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Chemours.

206.     In breach of their fiduciary duties, the Individual Defendants caused the Company

to engage in the misconduct described herein.

207.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

208.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period, which assured investors the Company's environmental risks and liabilities were enormously less than what they were, which made the Company's financial position look less dire than it actually was.

209.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

210.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

211.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain

adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

212.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

213.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Chemours has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214.    Plaintiff on behalf of Chemours has no adequate remedy at law.

**FOURTH CLAIM**

**Against Individual Defendants**
*for Unjust Enrichment*

215.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Chemours.

217.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Chemours tied to the performance or artificially inflated valuation of Chemours, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

218.    Plaintiff, as a stockholder and a representative of Chemours, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits, including benefits, performance-based, valuation-based, and other compensation obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

219.    Plaintiff on behalf of Chemours has no adequate remedy at law.

### FIFTH CLAIM

**Against Individual Defendants**
*for Waste of Corporate Assets*

220.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221.    As a result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and Chemours will lose financing from investors and business from future customers who no longer trust the Company and its products.

222.    Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

223.    Plaintiff on behalf of Chemours has no adequate remedy at law.

### PRAYER FOR RELIEF

224.    **FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Chemours, and that Plaintiff is an adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Chemours;

C.      Determining and awarding to Chemours the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest therein; and

D.      Directing Chemours and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Chemours and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1)      A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2)      A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

3)      Awarding Chemours restitution from Individual Defendants;

4)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

5)      Granting such other and further relief as the Court may deem just and proper.

Dated: October 12, 2020            Respectfully submitted,

**O'KELLY & ERNST, LLC**

<u>/s/ *Ryan M. Ernst*</u>
 Ryan M. Ernst (No. 4788)
824 N. Market Street, Suite 1001A
Wilmington, DE 19801
(302) 778-4000
rernst@oelegal.com

*Attorneys for Plaintiff*

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
55 Broadway, 10th Floor
New York, NY 10006
T. 212.363.7500
F. 212.363.7171
gnespole@zlk.com

*Attorneys for Plaintiff Andrew Persaud*